## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **JOSH KREHBIEL,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 19-2002-JAR** |
| **UNION PACIFIC RAILROAD CO.,** | |
| **Defendant.** | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Josh Krehbiel filed suit against Defendant Union Pacific Railroad Company ("Union Pacific") alleging a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., as amended.  Before the Court is Defendant's Motion for Summary Judgment (Doc. 58).  It asserts that Plaintiff cannot demonstrate that he was discriminated against on the basis of his disability.  The motion is fully briefed, and the Court is prepared to rule.  For the reasons set forth in detail below, the Court grants the motion.

## I.      **Legal Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.[6]  Once the movant has met this initial burden, the

burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine

issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its

burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in

evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]

To accomplish this, the facts "must be identified by reference to an affidavit, a deposition

transcript[,] or a specific exhibit incorporated therein."[10]  The non-moving party cannot avoid

summary judgment by repeating conclusory opinions, allegations unsupported by specific facts,

or speculation.[11]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it

is an important procedure "designed 'to secure the just, speedy and inexpensive determination of

---

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

every action.'"[12]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[13]

## II.    Facts

The following facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

*Plaintiff's Position and Job Duties*

Defendant is an interstate Class I freight railroad linking 23 states in the western two-thirds of the United States by rail.  It is headquartered in Omaha, Nebraska.  It employs more than 35,000 employees.

Defendant hired Plaintiff on March 10, 2015, as an Assistant Signalperson.  Plaintiff was an hourly employee and a union member.  As an Assistant Signalperson, Plaintiff was part of a construction crew (called a gang) which consisted of other Assistant Signalmen, Signalmen, and a Foreman.

Plaintiff's job duties included installing various railroad signals and grade-crossing protecting equipment that affect train movement for Defendant and the general public.  In addition, Plaintiff's job functions included installing foundations, gates, signals, signal-crossing warning devices and lights; loading and unloading supplies and heavy equipment from trucks; digging ditches and trenches for cable and foundations for signals; climbing and troubleshooting signal structures; handling cable and installing it underground; making electrical connections; and driving commercial vehicles, such as boom trucks, that require a commercial driver's license

---

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[13] *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

("CDL") to operate.  Assistant Signalpersons work around live tracks and trains, electrical currents, and operate commercial vehicles.  As an Assistant Signalperson, Plaintiff was a safety-sensitive employee.  From March 2015 through July 2016, Bob Thompson, Manager of Signal Construction, supervised Plaintiff.  In August 2016, Plaintiff began reporting to Chris Ehlers, Manager of Signal Construction.

Nearly all of Plaintiff's job duties required out-of-town travel because his gang was responsible for performing its work across a large geographic area.  His schedule was eight-days-on and six-days-off, working Tuesday to Tuesday.  Plaintiff typically traveled from his home in Salina, Kansas on Monday evening to the location of his work assignment so that he was able to report to work at 7:00 a.m. on Tuesday.  He would travel back to Salina the following Tuesday after his shift concluded.

*Plaintiff's Alcohol Use Prior to his Employment*

Plaintiff drank alcohol heavily from about 2008 until 2014.  He checked himself into a rehabilitation program in 2014.  By that time, he was drinking a fifth (standard size bottle) of liquor a day.

In June 2014, Plaintiff discussed his alcohol abuse with Dr. Johnston, his personal physician, for the first time.  He told her that he had been drinking a liter of vodka nightly for approximately the last six months.  Dr. Johnston noted that Plaintiff's alcohol abuse was severe.

Plaintiff was not able to quit drinking, and he was admitted for inpatient residential substance dependence in July 2014.  Plaintiff reported a history of withdrawal symptoms.  He also reported a history of anxiety, disorganized thinking, excessive worry, and an inability to concentrate among other things.  Plaintiff reported considering suicide more than once.  Based on the information that Plaintiff provided, the facility judged the severity of his substance abuse

as "highly problematic."  On July 29, 2014, Plaintiff was discharged, and further treatment was recommended.  His prognosis was "guarded," indicating that he was at a significant risk for relapse.

*2016 Events*

Plaintiff stayed sober until 2016.   In February 2016, Plaintiff relapsed and started drinking alcohol again while he was working for Defendant at a job site in Colorado.  On February 13, 2016, Plaintiff's coworkers found him in his hotel room after he stopped showing up for work.  He had been drinking heavily for a day-and-a-half, was highly intoxicated, blacked out, and unable to walk.  He told his co-workers that he wanted to kill himself because he "fell off the wagon."

Plaintiff's co-workers called emergency responders.  When the police arrived, Plaintiff was naked, intoxicated, and stated that he wanted to kill himself.  The police placed Plaintiff on a mental-health hold, and he was transported to an emergency room in Thornton, Colorado for evaluation.

Plaintiff was admitted to the hospital for suicidal ideation and alcohol abuse with intoxication.  His blood alcohol level was 349 mg/dL (.349).  On February 14, Plaintiff was discharged from the hospital.  Prior to his discharge, Plaintiff was treated with Lorazepam and warned of the potential side effects of the medicine.  He was cautioned about attempting to drive all the way back to Kansas while taking the medication.  Plaintiff stated that he understood.

On that day, Plaintiff contacted Defendant's Employee Assistance Program ("EAP") and reported that he had an alcohol problem and wanted to go into treatment.  Plaintiff testified that he was probably intoxicated when he made the call.  Defendant placed him on a medical leave of absence that day.

Later on February 14, Plaintiff stopped by a liquor store to purchase a bottle of vodka to drink on his drive home from Colorado to Kansas. Plaintiff was arrested by the Kansas Highway Patrol for driving while intoxicated ("DUI") after being observed driving at 95 miles per hour and engaging in a high-speed chase for approximately 16 miles. When Plaintiff was pulled over, he exited his vehicle and dropped a nearly empty vodka bottle on the road. He told the officer he was on his way to Tennessee to check into an alcohol rehab program.

Plaintiff was in jail from February 14 through February 17. It was his fourth DUI charge. Plaintiff ultimately pleaded guilty to misdemeanor DUI. His driver's license and CDL were suspended, and he served three days of house arrest.

On February 18, 2016, Plaintiff was admitted to Cornerstone of Recovery in Tennessee for its residential relapse recovery program. Defendant's EAP provided Plaintiff with a referral to Cornerstone. As part of his intake assessment, Plaintiff admitted he had a history of alcohol-induced blackouts and they lasted for several hours. He also reported that the year and seven months he was sober were the best years of his life. When he relapsed, he fell into a deep depression.

On March 19, 2016, Plaintiff was discharged from Cornerstone and further treatment was recommended. His diagnosis was: alcohol use disorder, severe; social phobia, unspecified; and major depressive disorder, single episode, unspecified. He was prescribed Gabapentin for anxiety. His prognosis was "guarded."

After leaving Cornerstone, Plaintiff participated in an intensive outpatient program through Central Kansas Foundation as part of his aftercare plan. He does not recall how long he participated in the program, but he testified that nobody wanted to be there, and he did not feel like it was a beneficial treatment program. On May 4, 2016, Plaintiff was discharged from

Central Kansas Foundation with diagnoses of: moderate alcohol use disorder, and unspecified depressive disorder.  Plaintiff returned to work with Defendant from his medical leave of absence on May 5, 2016.

*2017 Events*

The last day Plaintiff performed work for Defendant was February 3, 2017.  On February 4, 2017, Plaintiff's co-workers went to his hotel room in Illinois after he did not report to the morning shift briefing.  He was covered in blood because he had cut both of his wrists during a drinking binge.  Police were called, and Plaintiff repeatedly asked the officer on the scene to shoot and kill him.  Plaintiff was admitted to an emergency room in Illinois for a suicide attempt, alcohol intoxication, overdose of Gabapentin, hemorrhage with hypotension, and bilateral wrist lacerations.

After Plaintiff was stabilized, he was transferred to St. John's Hospital in Springfield, Illinois for surgery to repair his wrists.  After surgery, he underwent a psychiatric evaluation at St. John's.  He reported that he had recently started drinking again in the past few weeks because of feeling overwhelmed due to multiple stressors, including his wife's cancer diagnosis.  He stated that he worked for the railroad and worked eight days on and then was home for six days.  Plaintiff reported that he only drank while on the road, and when he drank, he drank until he passed out.  As a result of Plaintiff's evaluation, St. John's noted that he had "multiple risk factors for suicide attempt including previous attempt, alcohol use, poor primary support, history of depression, feelings of hopelessness and impulsivity."[14]  He was diagnosed with chronic depression; an acute suicide attempt; and chronic, episodic alcohol abuse.  Plaintiff was admitted for inpatient psychiatric treatment.

---

[14] Doc. 59 ¶ 69 (citing Ex. BBB, Plaintiff's Medical Records).

Defendant placed Plaintiff on a medical leave of absence effective February 4, 2017. Plaintiff was discharged from St. John's on February 8, 2017.  On February 9, Plaintiff was admitted to Sierra Tucson, a dual residential treatment center for substance dependence and mental health in Tucson, Arizona.

Plaintiff participated in treatment at Sierra Tucson until his discharge on March 10, 2017. His discharge diagnoses were: alcohol use disorder, severe; persistent depressive disorder with intermittent major depressive episodes, recurrent, severe; and generalized anxiety disorder vs. substance-induced anxiety.  Plaintiff's prognosis was "fair and contingent upon his adherence to the full 90 day outpatient plan."[15]

On March 14, 2017, Plaintiff had a follow-up appointment with Dr. Johnston.  She agreed with Plaintiff's assessment that he was unable to work at that time.  She completed a Supplemental Doctor's Statement for the U.S. Railroad Retirement Board stating that Plaintiff was not able to work without restrictions in his last occupation and provided an estimated return to work date of May 8, 2017.  Dr. Johnston does not recall how she determined the return date, but she acknowledged that the date was an estimate and she intended to see Plaintiff again before definitively deciding to return him to work.

On April 6, 2017, Defendant extended Plaintiff's medical leave of absence for another 60 days.  On April 25, 2017, Plaintiff had a follow-up appointment with Dr. Johnston.  Plaintiff expressed to her that he needed more time to get stable before he returned to work.

Following notification from EAP that Plaintiff had attempted suicide, Defendant's Health and Medical Services Department ("HMS") initiated a fitness-for-duty evaluation to determine whether Plaintiff could safely perform the essential functions of his job with or without

---

[15] Doc. 59 ¶ 77 (citing Ex. CCC, Plaintiff's Medical Records).

reasonable accommodations.  As part of the evaluation, HMS requested copies of Plaintiff's medical records to conduct an individualized assessment.  Defendant's Associate Medical Director, Dr. Lewis, reviewed the medical records, worked with EAP to evaluate Plaintiff's case and his treatment, and drafted a fitness-for-duty determination for the Chief Medical Officer's review.

On May 7, 2017, Dr. Lewis recommended the following work restrictions for Plaintiff: (1) not to operate company vehicles, on-track or mobile equipment, or fork-lifts; (2) not to work on or near moving trains, freight cars, or locomotives, unless protected by barriers; (3) not to operate cranes, hoists, or machinery if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee; (4) not to work at unprotected heights, over 4 feet above the ground; (5) not to perform work where decisions or actions can affect the safety of others (not to work as a Train Dispatcher or similar safety-sensitive positions); and (6) require these work restrictions to be permanent.  Dr. Lewis was concerned about the recurrent nature of Plaintiff's conditions, their lack of control, and that they manifested in a suicide attempt.  In addition, Dr. Lewis was concerned that Plaintiff's alcohol use disorder and depression would recur, along with his propensity towards self-harm, in a situation where his intent to harm himself could seriously jeopardize him as well as others.

On May 9, 2017, Ehlers (Plaintiff's supervisor) received a Restriction Review Form from HMS.  The Form notified him that Plaintiff was released to return to work with the restrictions recommended by Dr. Lewis.  In reviewing these restrictions, Ehlers determined that Plaintiff could not perform the essential functions of his job within the restrictions and that the restrictions could not be reasonably accommodated because any accommodation would require removing an essential job function.

On May 15, 2017, Defendant's Chief Medical Officer, Dr. Holland, finalized the fitness-for-duty determination and issued the same restrictions as recommended by Dr. Lewis.  In the determination, Dr. Holland reviewed Plaintiff's medical records and history.  Dr. Holland did not examine or talk with Plaintiff, and he did not speak with Dr. Johnston, Plaintiff's personal doctor.  Dr. Holland noted that Plaintiff had been diagnosed with severe alcohol use disorder with ongoing problems with depression and anxiety.  He determined that while the medical conditions were currently being treated with medications and therapy, there was a likelihood that the behaviors would continue to recur in the future.  In addition, Dr. Holland concluded that Plaintiff working around live track created a risk for Plaintiff hurting himself or others.  Dr. Holland relied, in part, on a report on psychiatric disorders and commercial motor vehicle driver safety that was presented to the Federal Motor Carrier Safety Administration ("FMCSA").  Dr. Holland ultimately concluded that "[i]t is unlikely that his risk for recurrence for severe alcohol use disorder, and his chronic depression and anxiety, will substantially diminish over time, so these unacceptable risks for safety at work should be considered permanent."[16]

On May 17, 2017, Terry Carver, Defendant's Director of Disability Management, mailed Plaintiff a letter regarding his referral to Disability Management for assistance.  The letter also enclosed the restrictions issued to Plaintiff in the fitness-for-duty determination.  Carver was responsible for helping employees return to work after they received medical restrictions from HMS.  Carver's team also provides vocational rehabilitation services to help the employee find other jobs within Defendant.  Plaintiff does not remember whether he pursued the vocational

---

[16] Doc. 59 ¶ 94 (citing Ex B., Dr. Holland Depo. and Ex. JJ, Fitness-for-Duty Determination).  Plaintiff attempts to dispute Defendant's facts regarding Dr. Holland's findings, but in reviewing Ex. JJ, Defendant accurately quotes it.

rehabilitation services offered, but he does not think that Defendant would have found him a different job.

On May 31, 2017, Dr. Johnston completed a Statement Sickness for RRB benefits for Plaintiff and estimated that Plaintiff would not be able to return to work until September 1, 2017 and did not believe that he was capable of working until that time.  She believed he needed more time to stabilize.

On June 12, 2017, Plaintiff had a follow-up appointment with Dr. Johnston.  During this visit, he informed her that he was still participating in outpatient therapy and going to Alcoholics Anonymous ("AA") meetings daily.  Dr. Johnston's plan was that Plaintiff would come back for a follow-up visit in three months to discuss and determine whether he could return to work.

On June 22, 2017, Plaintiff was discharged from his outpatient program through Lion Rock.  Its document indicated that he was discharged for non-compliance.  Plaintiff stated that he switched from online meetings with Lion Rock to in-person meetings provided by AA.

In July 2017, Plaintiff began fulltime employment with another employer as an inspector packer.  On July 12, 2017, Dr. Johnston prepared a note stating: "Patient may return to work 7-12-17."[17]  She testified that she prepared the note at Plaintiff's request.  Dr. Johnston did not meet with him prior to preparing the note.  She also did not receive any records from Sierra Tucson regarding Plaintiff's treatment and was not involved in Plaintiff's outpatient treatment program.  She testified that she was unaware that Plaintiff had been discharged from his outpatient program.  In making her assessment on Plaintiff's ability to return to work, she relied upon his self-report that he could perform his job functions.  Dr. Johnston did not know Plaintiff's specific job functions.

---

[17] Doc. 59-45

On September 17, 2017, Dr. Johnston drafted a letter stating: "The patient has been receiving treatment for his alcoholism and has been sober since undergoing treatment in February 2017.  In my medical opinion he is not disabled and has no work restrictions."[18]  She based her letter on Plaintiff's self-reporting.

*2018-2019 Events*

On July 24, 2018, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC").  On October 4, 2018, an APRN, Cathy Weitzel, prepared a return-to-work letter on Plaintiff's behalf in which she recommended that Plaintiff be allowed to return to work for a one-month trial period.  On October 29, 2018, Dr. Holland sent Plaintiff a letter in response to Weitzel's letter stating that Plaintiff's work restrictions would remain in place.

Plaintiff filed this lawsuit on January 2, 2019.  He asserts a claim under the ADA that Defendant discriminated against him when it refused to allow him to return to his job following his medical leave of absence and by permanently refusing to allow him to return to his job.

Dr. Terry Davis, a board-certified forensic psychiatrist with over 30 years of psychiatry experience, prepared an expert report in this case.  In this report, he concluded that Dr. Holland's fitness-for-duty determination was "fair, reasonable, and medically appropriate."[19]  Dr. Davis concluded that Plaintiff's conditions are chronic, recurring conditions that cause him to experience relapse into alcohol use and severe depressive and anxiety symptoms.  In addition, Dr. Davis concluded that during Plaintiff's drinking binges, his ability to safely perform his job duties is severely impaired due to the influence of alcohol, and at such times, he presents a

---

[18] Doc. 59-46.

[19] Doc. 59 ¶ 101 (citing Ex. M, Davis Expert Report).

serious and direct threat to the health and safety of himself and others.  Dr. Davis also

determined that Plaintiff was unable to perform the essential job functions of an Assistant

Signalperson, that he should be considered unfit for duty and unfit for working in any safety

critical job at Defendant, and that no reasonable accommodation could be made to allow Plaintiff

to return to work at a safety-critical job.[20]

### III.    Discussion

Defendant seeks summary judgment on the basis that Plaintiff cannot establish a

disparate-treatment claim under the ADA[21] because (1) he cannot establish that he was a

qualified individual, and (2) he cannot demonstrate that Defendant acted with discriminatory

intent because of his disability.[22]  Defendant asserts that Plaintiff cannot establish a disparate-

treatment claim under the ADA through either direct or indirect evidence.  Plaintiff fails to

address this contention and does not state whether the Court should proceed under a direct or

indirect evidence standard.  Plaintiff also does not direct the Court to any evidence for which he

contends is direct evidence of discrimination.  Thus, the Court will proceed under the familiar

burden-shifting indirect evidence analysis set forth in *McDonnell Douglas*.[23]

---

[20] Plaintiff attempts to dispute most of these facts relating to his fitness-for-duty, but he does not dispute the findings the doctors made.  He primarily disputes Defendant's interpretation.  In addition, he contends that there is no objective evidence that will forever cause him to pose a direct threat.

[21] This Court previously found that Plaintiff failed to state a failure to accommodate claim and could not bring it because it was unexhausted and time-barred.  *See* Doc. 29.

[22] Defendant also asserts that Plaintiff failed to administratively exhaust a portion of his discrimination claim.  The Court finds it unnecessary to address this procedural contention because Plaintiff cannot substantively establish a disability discrimination claim.

[23] *See E.E.O.C. v. C.R. England, Inc*., 644 F.3d 1028, 1037–38 (10th Cir. 2011) (setting forth the *McDonnell Douglas* burden shifting analysis for an ADA discrimination claim based on indirect evidence of discrimination).

Under *McDonnell Douglas*, the plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[24]  The burden of establishing the prima facie case is "not onerous."[25]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[26]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[27]

A.      Prima Facie Case

To establish a prima facie case of discrimination under the ADA, there are three elements: "the plaintiff (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."[28]

Defendant does not dispute that the first and third elements are met. But Defendant challenges the second element of Plaintiff's prima facie case on two grounds.  First, Defendant asserts that Plaintiff cannot demonstrate that he was a qualified individual because he was incapable of working at the time Ehlers reviewed the medical restrictions and determined that Plaintiff could not perform the essential functions of his job.  Defendant states that Plaintiff's personal doctor had not even released him to work at that time.  Defendant is apparently using

---

[24] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[25] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 238, 253 (1981).

[26] *Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[27] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[28] *Justice v. Crown Cork & Seal Co.*, 527 F.3d 1080, 1086 (10th Cir. 2008) (citation omitted).

May 9, 2017 as the relevant date, the day Ehlers, Plaintiff's direct supervisor, made the determination that Plaintiff's restrictions precluded him from his position.  Plaintiff, however, remained on a medical leave of absence on that date because on April 6, 2017, Defendant extended Plaintiff's medical leave of absence for 60 days.  Thus, May 9 is not the appropriate or relevant date to make a finding as a matter of law that Plaintiff was not qualified to perform his job.

Second, Defendant contends that Plaintiff cannot demonstrate that he could safely perform the essential functions of his job.  Regardless of the specific date that Plaintiff's medical leave of absence ended, he must be qualified to perform the essential functions of his job. "Under the ADA it is a defense to a charge of discrimination if an employee poses a direct threat to the health or safety of himself or others."[29]  "[T]he term 'direct threat' means 'a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.'"[30] Although it is typically the employer's burden to demonstrate that the employee is a direct threat, "where the essential job duties necessarily implicate the safety of others, then the burden may be on the plaintiff to show that [he] can perform those functions without endangering others."[31]

Plaintiff does not acknowledge that it is his burden to show that he is not a direct threat and that he can perform his essential job duties.  In addition, he does not address whether he is a qualified individual.  Instead, Plaintiff contends that the only question before the Court is

---

[29] *Id.* at 1091 (quotation marks and citations omitted).

[30] *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1088 (10th Cir. 1997) (quoting 42 U.S.C. § 12111(3)) (footnote omitted).  "The EEOC has supplemented the statutory definition by adding the following words: 'a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation.'"  *Id.* at 1088 n. 11 (quoting 29 C.F.R. § 1630.2(r)).

[31] *Justice,* 527 F.3d at 1091 (quoting *McKenzie v. Benton*, 388 F.3d 1342, 1354 (10th Cir. 2004)); *see also Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) (citations omitted) (noting that the existence of a direct threat is normally the employer's burden to prove but if the essential job duties implicate the safety of others, the burden is on the employee to demonstrate that he can perform those duties without endangering others).

whether Defendant reasonably concluded through an individualized assessment that relied on the best objective evidence that Plaintiff would pose a direct threat forever.  Plaintiff provides no binding authority for this proposition.[32]  Whether Plaintiff was qualified to perform his essential job functions requires an analysis of whether Plaintiff posed a direct threat, and the burden falls on Plaintiff.[33]  The Court notes, however, that a relevant consideration will be the objective evidence underlying the reasonableness of Defendant's conclusion that Plaintiff posed a direct threat.

First, the Court evaluates Plaintiff's essential job functions.  Defendant provides evidence that Plaintiff's essential job duties implicated the safety of others.  It is uncontroverted that Plaintiff's job duties included installing various railroad signals and grade-crossing protection equipment that affect train movement for Defendant and the general public.  In addition, Plaintiff's job functions included installing foundations, gates, signals, signal-crossing warning devices and lights; loading and unloading supplies and heavy equipment from trucks; digging ditches and trenches for cable and foundations for signals; climbing and troubleshooting signal structures; handling cable and installing it underground; making electrical connections; and driving commercial vehicles, such as boom trucks, that require a CDL to operate.  In addition, Assistant Signalpersons work around live tracks and trains and electrical currents.[34]  Due to the

---

[32] As will be noted and discussed, Plaintiff relies heavily on a Fifth Circuit opinion, *Nall v. BNSF Ry.*, 917 F.3d 335 (5th Cir. 2019)  Yet, even in *Nall*, the Fifth Circuit proceeded under the burden-shifting analysis of *McDonnell Douglas* and analyzed whether the plaintiff could meet the second element of the prima facie case before proceeding to a pretext analysis.  *Id.* at 341–43, 348.

[33] *See Jarvis*, 500 F.3d at 1122.

[34] Plaintiff states that his job only involved digging ditches, but he does not appropriately or adequately controvert Defendant's evidence of Plaintiff's essential job duties.  Plaintiff only cites to a portion of his deposition testimony that he dug ditches.  Plaintiff's direct supervisor provided an affidavit setting forth the essential job duties of an Assistant Signalperson.  Defendant also directs the Court to other parts of Plaintiff's deposition in which he testified that he performed many of the duties of an Assistant Signalperson.  Thus, the Court relies on Defendant's uncontroverted evidence of Plaintiff's essential job duties.

risks of working around live tracks and trains and electrical currents, the Court concludes that Plaintiff's job duties implicate the safety of himself and others.

When determining whether an employee poses a direct threat, the Tenth Circuit has stated that "the fact-finder does not independently assess whether it believes that the employee posed a direct threat."[35]  Instead, "the fact-finder's role is to determine whether the employer's decision was objectively reasonable."[36]  "[O]bjective reasonableness may well depend on whether professional advice is obtained."[37]  The "direct threat" determination "shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job.  This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence."[38]  Some of the relevant factors include: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm."[39]

Plaintiff contends that a reasonable person could find that Defendant failed to conduct a meaningful individual assessment of his ability to safely perform his job functions.  He claims that the person who issued the restrictions did not know about the essential functions of his position and issued them without examining him.  He also contends that since the restrictions are permanent, Defendant did not factor in his treatment and possibility of future treatment.

---

[35] *Jarvis*, 500 F.3d at 1122 (relying on *Bragdon v. Abbott*, 524 U.S. 624 (1998)).

[36] *Id*.

[37] *Id.* (citing 29 C.F.R. § 1630.2(r)).

[38] 29 C. F.R. § 1630.2(r).

[39] *Id.*

Defendant, however, provides evidence that it conducted an individualized assessment. Dr. Lewis, Defendant's Associate Medical Director, first reviewed Plaintiff's medical records and drafted a fitness-for-duty determination.  In this assessment, Dr. Lewis issued work restrictions based on the nature of Plaintiff's recurrent conditions, their lack of control, and their recent manifestation in a suicide attempt.  To the extent Plaintiff contends that Dr. Lewis did not know about the essential functions of Plaintiff's position, the deposition testimony cited by Plaintiff does not support this contention.

In addition, Dr. Holland, Defendant's Chief Medical Officer, finalized the fitness-for-duty determination.  Dr. Holland reviewed Plaintiff's medical records and history.  Although Dr. Holland did not examine Plaintiff, he had the benefit of Plaintiff's medical records.  He noted that Plaintiff had been diagnosed with severe alcohol use disorder with ongoing problems with depression and anxiety.

Furthermore, both Dr. Lewis and Dr. Holland appeared to have reasonably considered Plaintiff's treatment and possibility of future treatment.  In determining whether to impose permanent restrictions, they noted the recurrent nature of Plaintiff's conditions and Plaintiff's lack of control when his alcohol use and depression would recur.  They noted his recent suicide attempt, and the concern that his alcohol use disorder and depression would recur, along with his propensity towards self-harm, in a situation where his intent to harm himself could seriously jeopardize him as well as others.  Dr. Holland specifically noted that while the medical conditions were currently being treated with medications and therapy, there was a likelihood that the behaviors would continue to recur in the future.  Thus, two doctors determined that there was

a permanent need for restrictions on Plaintiff's work duties because of the threat of harm to himself and others.[40]

Plaintiff also asserts that a reasonable person could find that Defendant did not rely on the most current medical knowledge and/or the best available objective evidence.  He states that the restrictions were issued by someone who is not a psychologist and did not rely on any medical journal.  In addition, he states that Dr. Holland and Dr. Lewis' opinions were contrary to his treating doctor's opinion.

Dr. Holland and Dr. Lewis reviewed all of Plaintiff's medical records and knew of his job duties.  Dr. Holland testified that Plaintiff's work around live track created a risk for Plaintiff hurting himself or others.  Dr. Holland relied, in part, on an evidence report on psychiatric disorders and commercial motor vehicle driver safety that was presented to the FMCSA.  In addition, although Plaintiff takes issue with the fact that Dr. Lewis and Dr. Holland were not psychologists, neither was Plaintiff's personal physician.  Furthermore, Dr. Johnston's determination that Plaintiff could return to work appears to be based on incomplete and unobjective medical information.  Defendant provides evidence that Dr. Johnston was unaware that Plaintiff had been discharged from his outpatient treatment program for non-compliance.  In May and June 2017, Dr. Johnston recommended extending Plaintiff's leave until September. She anticipated releasing him to work when she met him again, but instead she issued a return-to-work statement in July based on Plaintiff's request for one.  In September 2017, Dr. Johnston issued a slightly more detailed statement in which she stated that in her medical opinion, Plaintiff was not disabled and did not have work restrictions.  Again, however, her letter was based on

---

[40] The Court notes that Dr. Holland only imposed restrictions on a safety critical railroad job and did not impose restrictions on a non-safety critical railroad job.

Plaintiff's self-reporting.  Finally, Dr. Johnston testified that she did not know what Plaintiff's job responsibilities entailed.  Thus, Plaintiff's physician's release to work was based on Plaintiff's self-reporting and not knowledge of his essential job duties.[41]  Accordingly, although Defendant's doctors did not speak to Plaintiff's personal physician about her belief that Plaintiff could return to work, this fact does not create a question of fact as to the objective reasonableness of Defendant's determination that Plaintiff posed a direct threat.

Plaintiff relies heavily on a Fifth Circuit opinion, *Nall v. BNSF*,[42] for support that Defendant's actions were not objectively reasonable.  In *Nall*, the Fifth Circuit determined that there was a question of fact as to the reasonableness of the defendant's determination that the plaintiff was a direct threat and relied on at least four pieces of evidence.[43]  First,  the defendant changed the job description to incorporate tasks the plaintiff could not do.[44]  Next, at least four doctors opined that the plaintiff could perform his essential job duties.[45]  In addition, the plaintiff successfully completed a field test demonstrating an ability to perform his job duties.[46]  Finally, the plaintiff provided evidence that the defendant's employees made multiple comments about the plaintiff never coming back to work because of his medical condition.[47]  Thus, the Fifth

---

[41] *See, e.g., Revels v. Lucent Techs., Inc.*, 60 F. App'x 740, 745–46 (10th Cir. 2003) (noting that the defendant articulated a legitimate, nondiscriminatory reason for not allowing the plaintiff to return to work because in part the medical release did not adequately explain the medical reasons why the plaintiff should return to work; and relying on *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 259 (5th Cir. 2001) which noted that a conclusory doctor's note based on plaintiff's self-assertion that he felt well enough to return to work was not probative evidence of the plaintiff's ability to work).

[42] 917 F.3d 335 (5th Cir. 2019).

[43] *Id.* at 343–45.  The Fifth Circuit considered this issue in the context of determining if there was a question of fact as to whether the plaintiff was a qualified individual.

[44] *Id.* at 344.

[45] *Id.* at 344–45.

[46] *Id.* at 345.

[47] *Id.* at 346.

Circuit found that there were questions of fact as to whether the plaintiff was a direct threat and a qualified individual.[48]

Notwithstanding that *Nall* is a Fifth Circuit opinion and non-binding precedent, none of the facts present in that case are present here.  Here, Plaintiff does not adequately controvert his job duties, and there is no question regarding Plaintiff's essential job duties.  There also is no evidence that Defendant changed Plaintiff's job duties in an effort to prevent him from being capable of performing his job duties.  In addition, here, although Plaintiff's personal physician opined that Plaintiff could return to work, her determination rested on incomplete information because it relied on Plaintiff's self-reporting.  She also had no knowledge of Plaintiff's specific job duties.  In contrast, there are two doctors who issued work restrictions based on a review of Plaintiff's medical history, determining that work restrictions were necessary due to the risk of harm to Plaintiff or others, with knowledge of Plaintiff's job duties.  Furthermore, Defendant's expert witness, a physician with 30 years of psychiatry experience, concluded that Dr. Holland's fitness-for-duty determination was reasonable.  Dr. Davis also concluded that Plaintiff was at-risk for relapse and unfit for the safety critical job of Assistant Signalperson.  Finally, Plaintiff does not point to *any* discriminatory comments regarding Plaintiff's disability.  Thus, the facts in this case are markedly different from those present in the *Nall* case.[49]

---

[48] *Id.*

[49] Plaintiff also relies heavily on what he contends is an identical recent case from the Southern District of Texas in which the court denied the defendant's motion for summary judgment. *See West v. Union Pac. R.R.*, No. 18-CV-3340, 2020 WL 1446908 (S.D. Tex. Mar. 24, 2020).  Again, that case is non-binding, and the facts are distinguishable.  In *West*, the Southern District of Texas noted that the issue before the court on summary judgment was "the narrow issue of direct threat on which [the defendant] move[d] for summary judgment." *Id.* at *4.  The court found that Dr. Holland's opinion rested on a "slender reed" because he did not cite medical research to support his conclusion that the plaintiff presented a higher likelihood in attempting suicide again because he previously attempted suicide. *Id.* at *4–5. In addition, the court found that the plaintiff's physician, who was a psychiatrist with special training relating to suicide risk, directly contradicted Dr. Holland's opinion. *Id.* at *4.  The psychiatrist reviewed the plaintiff's work duties in detail and concluded that he could perform the safety-sensitive work. *Id.*
      In this case, Defendant moves for summary judgment on more than the direct threat issue.  In addition, in contrast to the facts in *West*, Plaintiff's physician had no specialized training in psychiatry or suicide risk, no

In sum, Plaintiff cannot demonstrate that there are questions of fact as to the objective reasonableness of Defendant's determination that Plaintiff was a direct threat.  Accordingly, he cannot demonstrate that he was a qualified individual and fails to establish a prima facie case of disability discrimination.

B.    Pretext

Assuming arguendo, that Plaintiff establishes a prima facie case of disability discrimination, the burden of production would shift to the defendant to demonstrate a legitimate and non-discriminatory reason for the action.[50]  Defendant meets this burden.  Defendant asserts that the reason Plaintiff was not returned to his position was because Plaintiff's supervisor, Ehlers, simply relied on the doctors' medical judgments and restrictions in making the determination that Plaintiff could not safely perform the essential functions of his job.

The burden then would shift back to the plaintiff to demonstrate that the defendant's reasons are pretext for discrimination.[51]  To establish pretext, a plaintiff must show that the defendant's proffered reasons are unworthy of belief.[52]  Furthermore, the Court must examine "the facts as they appear to the person making the decision."[53]

Plaintiff does not address Defendant's assertion or pretext.  Plaintiff does not discuss discriminatory intent in his briefing at all.  As noted above, Plaintiff only addresses whether Defendant reasonably concluded that Plaintiff would pose a direct threat forever.  Thus, in failing

---

knowledge of Plaintiff's actual job duties, and no specific opinion that Plaintiff could perform the safety-sensitive work.  Instead, she simply determined that he could return to work. Thus, the Court finds that the facts here differ from the facts in *West*.

[50] *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011).

[51] *Id.*

[52] *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006).

[53] *C.R. England*, 644 F.3d at 1044 (quotation marks and citation omitted).

to respond to Defendant's argument regarding discriminatory intent, Plaintiff appears to concede Defendant's assertion that there was no discriminatory intent.  Accordingly, even if Plaintiff could establish a prima facie case, he cannot demonstrate that Defendant's decision was pretextual.  In sum, Plaintiff cannot demonstrate a genuine issue of material fact as to whether Defendant discriminated against him based on his disability.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 58) is **granted**.

**IT IS SO ORDERED.**

Dated: September 11, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE